## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In RE: | § § | |
| HIGH MESA, INC. | § § | Case No. 20-30602 |
| PETRO OPERATING COMPANY, LP | § § | Case No. 20-30603 |
| PETRO ACQUISITIONS, LP | § § | Case No. 20-30604 |
| HIGH MESA HOLDINGS, LP | § § | Case No. 20-30605 |
| Debtors. | § § | (Chapter 7 cases) |

**TRUSTEE'S EMERGENCY MOTION FOR: (A) ENTRY OF AN INTERIM AND FINAL ORDER AUTHORIZING THE TRUSTEE TO OPERATE BUSINESS AND (B) SETTING A FINAL HEARING DATE**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JANUARY 31, 2020 AT 4:00 PM (PREVAILING CENTRAL TIME) IN COURTROOM 404, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TX 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR**

> **TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **RELIEF IS REQUEST NOT LATER THAN JANUARY 31, 2020.**

TO THE HONORABLE MARVIN ISGUR, U.S. BANKRUPTCY JUDGE:

Christopher Murray, Chapter 7 Trustee for Debtors High Mesa, Inc. ("**HMI**"), Petro Acquisitions, LP ("**Acquisitions**"), Petro Operating Company, LP ("**POC**"), High Mesa Holdings, LP ("**Holdings**") (collectively, the "**Debtors**") files this *Trustee's Emergency Motion for: (a) Entry of an Interim and Final Order Authorizing the Trustee to Operate Business and (b) Setting a Final Hearing Date* (the "**Emergency Motion**"),[1] and respectfully state the following:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This Court has constitutional authority to enter a final order regarding this matter because operation of a business in chapter 7 has no equivalent in state law, thereby rendering the Supreme Court's opinion in *Stern v. Marshall* inapplicable to the matter at hand.

## II. BACKGROUND

**a. The Bankruptcy Case**

2. On January 24, 2020 ("**Petition Date**"), the Debtors and their affiliates each filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code thereby commencing the Chapter

---

[1] Contemporaneously herewith, the Trustee filed the *Trustee's Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 7 Cases* seeking joint administration of the Debtors' and their affiliates estates. Pursuant to the relief requested therein, the Trustee filed the instant Application in the HMI estate, Case No. 20-30602, as well as in the estates for Holdings, PA, and POC.

7 Cases.[2]

3.  Christopher Murray was duly appointed as the chapter 7 trustee for each of the Debtors and their affiliates.

**b. The "Blackjack Creek" Fields and Processing Facility**

4.  After his appointment, counsel for the Debtors contacted the Trustee regarding gas producing fields and a processing facility near Pensacola, Florida operated by Acquisitions and POC known as "Blackjack Creek" ("**Blackjack**"). The Trustee learned that this particular asset included fields with wells that produced "sour gas"[3] and a related processing facility that was used to remove

---

[2] The case number for each of the Debtors' estates is as follows: (1) High Mesa, Inc., Case No. 20-30602; (2) Petro Operating Company, LP, Case No. 20-30603; (3) Petro Acquisitions, LP; Case No. 20-30604; (4) High Mesa Holdings, L.P., Case No. 20-30605; (5) The Meridian Resource and Exploration, LLC, Case No. 20-30606; (6) High Mesa Holdings GP, LLC, Case No. 20-30607; AM Idaho, LLC, Case No. 20-30608; (7) Louisiana Onshore Properties, LLC, Case No. 20-30609; (8) AMH Energy New Mexico, LLC, Case No. 20-30610; (9) AM Michigan, LLC, Case No. 20-30611; (10) Texas Energy Acquisitions, LP, Case No. 20-30612; (11) Cairn Energy USA, LLC, Case No. 20-30613; (12) The Meridian Production, LLC, Case No. 20-30614; (13) High Mesa Services, LLC, Case No. 20-30615; (14) HMS Kingfisher Holdco, LLC, Case No. 20-30616; (15) Alta Mesa Acquisition Sub, LLC, Case No. 20-30619; (16) Alta Mesa Drilling, LLC, Case No. 20-30620; (17) Alta Mesa Energy, LLC, Case No. 20-30621; (18) Alta Mesa GP, LLC, Case No. 20-30622; (19) Aransas Resources, LP, Case No. 20-30623; (20) ARI Development, LLC, Case No. 20-30624; (21) Brayton Management GP II, LLC, Case No. 20-30625; (23) Brayton Resources II, LP, Case No. 20-30626; (24) Brayton Resources, LP, Case No. 20-30627; (25) Buckeye Production Company, LP, Case No. 20-30628; (26) FBB Anadarko, LLC, Case No. 20-30629; (27) Galveston Bay Resources, LP, Case No. 20-30630; (28) LEADS Resources, LLC, Case No. 20-30632; (29) Louisiana Exploration & Acquisition LP, Case No. 20-30634; (30) Navasota Resources Ltd. LLP f/k/a Hilltop Acquisition, LLC, Case No. 20-30635; (31) Nueces Resources, LP, Case No. 20-30637; (32) Sundance Acquisition, LLC, Case No. 20-30638; (33) TEA Energy Services, Case No. 20-30639; (34) The Meridian Resource, LLC, Case No. 20-30640; and (35) Virginia Oil and Gas, LLC, Case No. 20-30641.

[3] "Sour gas refers to natural gas that contains significant amounts of acidic gases such as hydrogen sulfide and carbon dioxide." Da Huo, *The Global Sour Gas Problem*, STANFORD ENERGY JOURNAL (Nov. 26, 2012), *available at* https://sej.stanford.edu/global-sour-gas-problem. As noted by OSHA, "[h]ydrogen sulfide is a colorless, flammable, extremely hazardous gas."*Hydrogen Sulfide (H$_2$S)*, OSHA FACT SHEET, *available at*
https://www.osha.gov/OshDoc/data_Hurricane_Facts/hydrogen_sulfide_fact.pdf.

**TRUSTEE'S EMERGENCY MOTION TO OPERATE**                                        Page **3** of **12**

certain chemicals from the natural gas that is necessary in order to market the product for sale. The Trustee was further informed that, due to the toxic nature of the sour gas, immediate attention was required to ensure the health and safety of those individuals that resided near the Blackjack facility.

5. Following that call, Scott Ricks, the former President of HMI, informed the Trustee about the condition of the Blackjack facilities, noting that operations had been shut down due to minor maintenance on the processing facilities.

6. Regardless of whether production continues, Mr. Ricks informed the Trustee that the facilities would need to be properly monitored to ensure that the sour gas did not leak from the field or facilities. Given the toxic nature of sour gas, a leak could pose serious danger to the residents of the surrounding area or otherwise cause a negative environmental impact. Mr. Ricks also informed the Trustee that, because the nature of sour gas production, the State of Florida required that an emergency plan be continuously kept in place that would allow for immediate contact of those individuals living in proximity of the plant in the event of an emergency when the field was operational.

7. Mr. Ricks also provided the Trustee with information concerning both: (a) the profitability of the field while it was operational and (b) the prospects for sale of the assets based on the Debtors' prior efforts to sell the Blackjack assets. According to Mr. Ricks, the Blackjack assets generally do not generate a profit, though at times, may result in breakeven operations. And although the Debtors have sought to sell or otherwise transfer the assets to third parties but have not had any interested parties. Mr. Ricks believes this is because of two factors: (a) a lack of profitability in operations; and (b) the plugging and abandonment liability associated with the fields that would likely cost upwards of $6.5 million.[4] According to Mr. Ricks, the only offer the Debtors ever received on

---

[4] Debtor Petro Acquisitions, LP's schedules indicate an "Asset Retirement Obligation" of $6,479,149.10 associated with plugging and abandoning the wells. Petition [DE #1], Schedule E/F, 3.1, pg. 37.

**TRUSTEE'S EMERGENCY MOTION TO OPERATE**　　　　　　　　　　　　　　　　Page **4** of **12**

the property would require the Debtors to pay over $4 million to the party that would acquire Blackjack. The Trustee is currently in the process of reviewing predecessors in title and Florida law to determine if any other party may be liable for future plugging and abandonment costs.

8. The Trustee also gathered additional information from Marty Lee, the former field manager for Blackjack. According to Mr. Lee, creditors Danos, LLC and R&R Contracting LLC are currently providing individuals who monitor the fields and processing plant on a rotating basis to ensure the safety of the plant. The monitoring of the fields involves ten individuals working in shifts, twenty-four hours a day, seven days a week to ensure no toxic chemicals are escaping at the wells or the facility. Mr. Lee further informed the Trustee that it was unlikely that the plant could be reopened for operations due to the specific need for emergency planning required by the State of Florida and inability to have an approvable plan due to the bankruptcy and lack of operating Debtors.

c. **The Costs of Monitoring Blackjack**

9. At the Trustee's request, Mr. Ricks prepared a weekly budget through March 30, 2020 for the monitoring and maintenance of the Blackjack, which is attached hereto as **Exhibit A**. The budget anticipates a total weekly cost of approximately $31,600 in order to keep the fields shut in and properly monitored while the Trustee seeks to identify the available options for divesting the assets safely.

10. The costs in the budget are broken down into eleven line-items. The majority of this cost is associated with "Field Contract Labor," which is the amount of costs associated with having contractors available to actively monitor the fields for safety purposes. This $24,500 line-item makes up approximately 78% of the weekly operating costs for the Blackjack facility. The second cost is utilities required to keep the plant running of $2500 per week, which makes up approximately 8% of the costs. The "Rentals-Surface" category ($750 per week) relates to equipment used in maintenance and safety operations. In addition, the budget includes a cost of $1200 per week for "Supervision,"

which would permit the Trustee to continue to utilize the services of Mr. Ricks in dealing with issues that arise from maintenance of the plant and attention to any emergency or required maintenance issues on the plant.[5] It would also allow Mr. Ricks to be available to the Trustee for purposes of assisting him in attempting to divest the assets as quickly as possible in order to eliminate the continuing cost to the estate of retaining the assets.

11. The Trustee is also exploring additional options to reduce the number of individuals required to monitor the facilities. Conversations with Mr. Lee indicated that it may be possible to reduce the number of people required to monitor the plant provided they had the appropriate safety instruments with them. But given the emergency nature of the relief requested, the Trustee has included the full cost of a 10-man shift in the budget to ensure the plant does not create a danger to the residents or environment surrounding the facility. To the extent that more cost-effective means of monitoring the plant are available without compromising safety concerns, the Trustee will make all efforts to reduce the actual expenditures associated with maintaining the assets. In addition, at the direction of the Trustee, proposed counsel at Jones Murray & Beatty LLP contacted the Florida Department of Environmental Protection to seek assistance in the maintenance, plugging, and potential abandonment of Blackjack.

### d. The Debtors' Ability to Pay for the Monitoring of Blackjack

12. The Trustee has reviewed the Debtors' schedules and records which indicate that only Holdings can pay the costs associated with monitoring Blackjack for any sustained period of time. POC has cash totaling only $11,752.03, while Acquisitions has no cash assets. As made evident by the

---

[5] In addition to assisting with the Blackjack Creek assets, Mr. Ricks would also provide services to the Trustee in liquidating the Debtors' and their affiliates other assets, including those located in Louisiana, the Gulf of Mexico, and Idaho. To the extent that the Trustee's efforts to divest the Blackjack Creek assets are successful, the Trustee would request authorization to continue payments to Mr. Ricks until the Trustee, in his business judgment, determines that Mr. Ricks' services are no longer needed for the administration of the estate.

budget, this limited amount of cash would not permit the Trustee to hire contractors necessary to monitor the fields and pay other expenses necessary to ensure the safety of the residents and environment surrounding Blackjack.

13. Holdings, however, has cash assets totaling $559,441.44 as of the Petition Date. Although these funds could not satisfy the obligation to plug and abandon Blackjack, Holdings cash reserves are sufficient to temporarily maintain the assets while the Trustee explores options on divesting the field and facility.

14. Per Mr. Ricks, the Holdings' cash is a conglomeration of receipts from the Debtors and their related entities that all filed for chapter 7 bankruptcy on the Petition Date. Moreover, Holdings has historically provided cash infusions for any shortfalls experienced by Acquisitions or POC when revenues from operations fell short of expenses. As the case was only recently filed, the Trustee has not had the time and opportunity necessary to perform a forensic examination of the bank records to determine the ultimate source for the cash in the Holdings accounts.

15. At the Trustee's request, Mr. Ricks provided an organizational chart for the Debtors and their affiliated entities (attached as **Exhibit B**). The document indicates that Holdings is the 99.9% owner of both POC and Acquisitions as a limited partner.[6] Ex. B. Although a limited partner is generally not held liable for the debts of a limited partnership, it is unclear at this early stage whether any exception to the general rule applies based on Holdings' active participation in the business. *See* TEX. BUS. ORGS. CODE § 153.102(a).

16. At this stage, the Trustee is still evaluating whether substantive consolidation may be proper under the Bankruptcy Code. If Holdings was an active participant in Acquisition and POC's operations, it could be liable for any liability associated with issues at the facility under the Texas Business Organizations code. Furthermore, the Comprehensive Environmental Response,

---

[6] Alta Mesa GP, LLC is the general partner, owning a 0.1% interest in the entities. Ex. B.

Compensation and Liability Act ("**CERCLA**") could lead to liability in the event of contamination from Blackjack. Although he has not yet fully analyzed the applicability of these or any other theories of joint liability, the Trustee believes, in his business judgment, that the risk associated with liability from potential contamination and the risks to human and environmental safety warrants expending of Holdings funds to monitor Blackjack on a temporary basis.

### III. RELIEF REQUESTED

17. The Trustee requests authority to operate Blackjack for a limited time in order to ensure the health and safety of the nearby residents while avoiding any environmental hazards associated with the sour gas field and processing facility. The Trustee requests that he be granted: (a) interim authority to make necessary payments of up to $126,400 for expenses incurred between January 27, 2020 and February 21, 2020 from the funds held in POC's and Holdings' bank accounts; and (b) final authority to make payments of up to $126,400 from Holdings' every four weeks thereafter until the property has been transferred, sold, or properly abandoned under applicable law. Authority to operate Blackjack is critical due to the potential risks to the health and safety of nearby residents and to avoid potential environmental damages relating to the presence of sour gas.

18. Although chapter 7 trustees do not usually operate a debtor's business, it may be appropriate where the continuation of the business will facilitate the possibility of a sale of the business as a going concern or where it is plainly necessary to preserve the estate's value for creditors. See, e.g., *In re Brierwood Manor, Inc.*, 239 B.R. 709 (Bankr. D. N.J. 1999) (trustee sought to continue business so as to maximize the value of the estate); *In re Transcon Lines*, 178 B.R. 228 (Bankr. C.D. Cal. 1995) (trustee may operate business of the debtor for a brief period of time in order to maximize the return on sale). Although continued operation of Blackjack is unlikely to increase the funds available through a sale, continued maintenance and operations will serve to avoid costs and potential liability associated

with any danger posed by a leak of sour gas. As a result, the Trustee believes it is in the best interest of the Debtors' estates to expend the funds necessary for proper monitoring.

19. The Trustee believes the proposed budget is sufficient to sustain operations for the period of time proposed. At this time, the Trustee is only requesting to operate Blackjack through March 30, 2020. If the Trustee believes additional time is necessary and in the best interests of the estate, the Trustee will file another motion with the Court setting forth the reasons why continuing operations even longer would be appropriate. If at any time before March 30, 2020, the Trustee believes that it no longer serves the best interest of creditors to continue to operate Blackjack, the Trustee seeks leave to cease operations as he deems appropriate.

20. The Trustee will comply with all reporting requirements under the Code relating to the operation of the business. The Trustee seeks to operate the business in the ordinary course until March 30, 2020. The Trustee will seek further order if the Trustee proposes to engage in any transaction under 11 U.S.C. §363.

21. The continued operation of Blackjack in this case serves the best interests of the bankruptcy estate by preserving the value of the Debtors' business by avoiding potential liability associated with the release of sour gas that could affect the health and safety of the nearby residents and environment.

### IV. EMERGENCY CONSIDERATION

22. Emergency consideration of this Motion is requested pursuant to Bankruptcy Local Rule 9013-1(i). The Trustee believes that immediate authorization is imperative to ensure the health and safety of nearby residents. Absent immediate relief and assurances of payment, the contractors currently monitoring Blackjack could leave the site, thereby increasing the risk of an unidentified leak of toxic sour-gas into the environment. Accordingly, the Trustee respectfully requests that this Court approve the relief requested in this Emergency Motion on an emergency basis.

**PRAYER**

WHEREFORE, the Trustee prays that the Court enter an order authorizing him to operate the Debtors' Blackjack assets, effective January 27, 2020, on an interim basis for the period of January 27, 2020 through February 21, 2020, that this matter be set for final hearing prior to February 21, 2020, and for such other and further relief as is just and proper.

Dated:  January 30, 2020

Respectfully submitted,

JONES MURRAY & BEATTY LLP

*/s/ J. Maxwell Beatty*
Erin Jones
Tex. Bar No. 24032478
erin@jmbllp.com
J. Maxwell Beatty
Tex. Bar No. 24051740
max@jmbllp.com
4119 Montrose Blvd., Suite 230
Telephone: (832) 529-1999
Facsimile: (832) 529-3393

*Proposed Counsel for Christopher Murray, Chapter 7 Trustee for the Debtors*

## CERTIFICATE OF ACCURACY

Pursuant to BLR 9013-1(i), I hereby certify that the information contained in the foregoing document with respect to the need for emergency relief is true and correct to the best of my knowledge.

/s/ J. Maxwell Beatty
J. Maxwell Beatty

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 30, 2020, a true and correct copy of the foregoing was served by electronic mail or via the Court's ECF system on the following parties:

| | |
|---|---|
| The United States Trustee<br>Hector Duran<br>Hector.Duran.Jr@usdoj.gov | R&R Contracting LLC<br>PO Box 948<br>Robertsdale, AL 36567 |
| The Florida Department of Environmental Protection<br>c/o Cindy Mulkey, Program Administrator<br>3900 Commonwealth Boulevard<br>Tallahassee, FL 32399<br>Cindy.Mulkey@dep.state.fl.us | Randy Williams<br>Byman & Associates PLLC<br>7924 Broadway, Suite 104<br>Pearland, TX 77581<br>rww@bymanlaw.com<br>*Counsel for the Debtors* |
| Danos, LLC<br>3878 West Main Street<br>Gray, LA 70359<br>Rocky.kiffe@danos.com | Alta Mesa Resources, Inc., *et al.*<br>c/o John F. Higgins<br>Porter Hedges LLP<br>1000 Main Street, 26th Floor<br>Houston, Texas 77002<br>jhiggins@porterhedges.com<br>apower@porterhedges.com<br>mdearman@porterhedges.com<br>George.davis@lw.com<br>Annemarie.reilly@lw.com<br>Brett.neve@lw.com<br>Caroline.reckler@lw.com<br>Andrew.sorkin@lw.com |

*/s/ J. Maxwell Beatty*
J. Maxwell Beatty